**WHITE & CASE LLP**
Gregory F. Pesce (*pro hac vice* pending)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
gregory.pesce@whitecase.com

- and -

Andrew F. O'Neill (*pro hac vice* pending)
300 North LaSalle Drive
Chicago, Illinois 60654
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
aoneill@whitecase.com

- and -

Amanda Parra Criste (*pro hac vice* pending)
Varoon Sachdev (*pro hac vice* pending)
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
aparracriste@whitecase.com
varoon.sachdev@whitecase.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Seth Van Aalten (*pro hac vice* pending)
Justin R. Alberto (*pro hac vice* pending)
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Facsimile: (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
jalberto@coleschotz.com
dharris@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>THE CHILDREN'S PLACE, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-22682 (SLM)<br><br>(Joint Administration Requested) |

1 A complete list of each of the debtors, including each debtors' tax identification number, in these chapter 11 cases may be obtained on the website of the debtors' proposed claims and noticing agent at https://omniagentsolutions.com/TCP. The location of the debtors' service address for purposes of these chapter 11 cases is 500 Plaza Drive, Secaucus, New Jersey 07094.

**DECLARATION OF RUDOLPH MORANDO,
CO-CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT
OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Rudolph Morando, Co-Chief Restructuring Officer ("Co-CRO") of The Children's Place, Inc. ("TCP") and the other above captioned debtors and debtors in possession (collectively, the "Debtors," and together with certain non-debtor affiliates, the "Company") declare as follows under penalty of perjury:

**Qualifications**

1. I am a Managing Director with Berkeley Research Group, LLC ("BRG") and have more than 20 years in management consulting and financial restructuring experience. BRG is a professional services firm with an office located at 2200 Powell Street, Suite 1200, Emeryville, California 94608. My responsibilities at BRG primarily involve consulting with corporate clients, specifically with regard to financial and strategic management, liquidity management, and implementation of financial strategies for corporate turnarounds and restructuring. In this capacity, I have advised debtors and creditors in and out of chapter 11. I have advised companies in a variety of industries, including retail. I have previously served as interim chief executive officer or chief restructuring officer of certain of these companies. On October 30, 2026, my colleague, Chris McAvinn, and myself were both appointed by the TCP board of directors to serve Co-CROs of the Company.

2. On November 8, 2026 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, in the United States Bankruptcy Court for the District of New Jersey (the "Court"). To minimize the adverse effects on their business, the Debtors have filed certain motions and pleadings seeking various types of "first day" relief (the "First Day Motions"), which will allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.

3. As financial advisor and Co-CRO, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I submit this declaration (the "Declaration") to assist the Court and the parties in interest in understanding the circumstances leading to the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the First Day Motions filed contemporaneously herewith.

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my experience and personal knowledge, (b) information obtained from members of the Debtors' management team, employees, or advisors, (c) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or (d) my opinions based upon my experience and knowledge. I am over the age of eighteen (18) and am authorized to submit this Declaration on behalf of the Debtors. If called as a witness, I could and would testify competently to the facts and opinions set forth in this Declaration.

## Preliminary Statement

5. Founded in 1969 and headquartered in Secaucus, New Jersey, the Company is one of the only pure-play children's specialty retailers in North America, operating under their flagship "The Children's Place" and "Gymboree" brands. The Company designs, contracts to manufacture, and sells fashionable, high-quality apparel, accessories, and footwear predominantly at value prices across an omni-channel network. As of the Petition Date, the Company's global retail and wholesale network included two (2) digital storefronts, 512 stores in North America, wholesale marketplaces, and 323 international points of distribution in thirteen (13) countries through various international franchise and wholesale partners. The Debtors' physical and digital stores serve the wardrobe needs of girls and boys, toddler girls and boys, and babies. The Debtors' wholesale business includes a relationship with Amazon, an important customer acquisition vehicle. The

Debtors also generate additional revenue from international franchisees through product sales and sales royalties.

6. The Company has faced significant headwinds in the last few years, including declining consumer demand in the value-oriented children's apparel segment, persistent cost inflation, elevated tariffs on imported goods, and intensified competitive and promotional pressure from both traditional retailers and e-commerce entrants. These pressures have driven a sustained decline in net sales and profitability. Net sales declined from approximately $1.386 billion in fiscal 2024 to approximately $1.209 billion in fiscal 2025. This downward trend continued in 2026: the Company recorded a net loss of approximately $84.1 million for the first half of fiscal 2026, compared to a net loss of approximately $39.4 million for the same period in the prior year. These results materially increased pressure on a business that requires substantial seasonal working capital to acquire inventory before the back-to-school and holiday selling periods.

7. To fund operations over the past two and a half (2.5) years, the Debtors have relied on a combination of debt and capital infusions. Specifically, Mithaq Capital SPC, a Cayman company ("Mithaq"), acquired a majority of the Company's common stock in 2024. Since then, Mithaq has sought to enhance operating controls, improve efficiency and reshape the Company's culture with a focus on innovation. Mithaq has supported the Company by providing the Debtors with substantial additional capital and liquidity through a series of unsecured, subordinated term loan facilities. The Debtors have also relied on a $350.0 million asset-based revolving credit facility with Wells Fargo Bank, National Association ("Wells Fargo") as agent, and a $100.0 million term loan with Crystal Financial LLC d/b/a SLR Credit Solutions ("SLR") as agent. As of November 6, 2026, the Debtors had approximately $130.5 million outstanding under the asset-based revolving facility, $100.0 million outstanding under the SLR term loan, and approximately

$151.1 million outstanding in the aggregate under the Mithaq term loans, in each case as further described in Part II below.

8. The Company undertook numerous initiatives to improve performance and liquidity, including expense reductions, inventory rationalization, changes to its wholesale strategy, and additional unsecured financing supplied by Mithaq in July 2026 and September 2026. Despite these efforts, the Debtors' liquidity position continued to deteriorate. On or around October 7, 2026, the Debtors' secured lenders imposed a $15.0 million restructuring reserve against availability under each of the asset-based revolving and term loan facilities (for an aggregate reserve of $30.0 million), and on October 21, October 28, and November 4, 2026, an incremental reserve of $5.0 million was implemented under each facility on each such date.

9. Starting in September 2026, the Debtors retained BRG as financial advisor, Cascadia Capital, LLC ("Cascadia") as investment banker, and White & Case LLP ("White & Case", and together with BRG and Cascadia, the "Advisors") as restructuring counsel to assist the Company in evaluating its restructuring options. On October 2, 2026, the Company appointed Elizabeth A. LaPuma as a member of the TCP board of directors and audit committee and on November 3, 2026, the TCP board formed a supervisory committee tasked with authority to oversee the Debtors' strategic initiatives (the "Special Committee") and appointed Ms. LaPuma as the sole director of the Special Committee. The Special Committee was vested with full power and sole and exclusive decision-making authority with respect to certain specified matters, including financing and sale transactions involving the Company and its subsidiaries.

10. Over the course of several months, the Company, along with its Advisors, evaluated a broad range of strategic options. These included a potential sale of all or substantially all of the Debtors' assets as a going concern, standalone sales of certain assets (for example, a sale of the

"Gymboree" intellectual property), as well as alternative structures to monetize the Debtors' intellectual property. These options are described further in Part III below.

11. With the upcoming holiday season, the Debtors, with the approval of the Special Committee, determined that the best option for maximizing value was to retain Tiger Capital Group, LLC, SB360 Capital Partners, LLC, and GA Retail Solutions, LLC (collectively, the "Consultant") to assist with the liquidation of inventory and certain other assets, while the marketing process for a going-concern transaction continued. The Consultant began liquidation sales on November 6, 2026. In parallel, the Debtors (i) with the assistance of their Advisors, commenced negotiations with their prepetition lenders regarding a consensual path forward and (ii) retained A&G Realty Partners, LLC (the "Real Estate Advisor") to analyze the Debtors' lease portfolio and support lease negotiations.

12. There is considerable interest in the Debtors' assets as the Debtors have received several proposals for all or a select portion of their assets. With Bankruptcy Court approval, the Debtors will run an in-court marketing and sale process to identify higher and better bids, including bid for substantially all of the Debtors' assets.

13. To facilitate its efforts to maximize value in these chapter 11 cases, the Debtors require continued access to cash collateral and new liquidity. Accordingly, leading up to the Petition Date, Cascadia commenced a marketing process for a debtor-in-possession loan. In parallel, the Company and its Advisors negotiated with Wells Fargo and SLR and their respective advisors for potential additional funding and use of cash collateral. Following Cascadia's marketing process, as described in the *Declaration of Lorie Beers in Support of the DIP Motion* filed contemporaneously herewith, the only viable option for post-petition funding was provided by the existing secured lenders.

14. The Debtors are seeking approval of superpriority debtor-in-possession financing consisting of an (i) asset-based revolving credit facility of up to $166.0 million (the "DIP ABL Facility"), with Wells Fargo serving as administrative and collateral agent ("DIP ABL Agent"), and (ii) a term loan facility of up to $116.0 million (the "DIP Term Facility" and, together with the DIP ABL Facility, the "DIP Facilities"), with SLR serving as administrative and collateral agent ("DIP Term Loan Agent" and together with the DIP ABL Agent, the "DIP Agents"). The DIP Facilities will provide the Debtors with access to revolving credit availability and will ultimately refinance the prepetition ABL and Term Loan obligations, including through the roll-up of such prepetition indebtedness. Upon Bankruptcy Court approval of the DIP Facilities, the Debtors will have access to over $11.0 million of new liquidity to support these chapter 11 cases.

15. The proposed DIP Facilities and access to cash collateral will ensure a smooth transition into these chapter 11 cases and is designed to provide the Debtors with sufficient liquidity to fund their streamlined operations and run a sale process for the assets. The proposed DIP Facilities include case milestones that provide for an achievable case timeline in connection with an approved budget and ongoing efforts by the Consultant.

16. As the Debtors' Co-CRO, and in consultation with the Company's management team and Advisors, it is my opinion that the DIP Facilities are the product of robust, arm's-length negotiations, fulfills the Debtors' chapter 11 goals, and are the best source of financing available to the Debtors. Accordingly, the Debtors are determined to move forward with approval of the DIP Facilities in a sound exercise of their business judgment.

17. To familiarize the Court with the Company, its business, and the circumstances leading to these chapter 11 cases, this Declaration is organized into four sections:

- **Part I** provides a general overview of the Company's history and business operations;

- **Part II** describes the Debtors' corporate structure and prepetition capital structure;
- **Part III** describes the circumstances leading to the commencement of these chapter 11 cases;
- **Part IV** describes the Debtors' chapter 11 case strategy; and
- **Part V** discusses the relief requested in the First Day Motions.

## I. Overview of the Company's History and Operations.

### A. Corporate History.

18. The Children's Place was founded in 1969 and became publicly traded on the Nasdaq Global Select Market in 1997. Its common stock trades on the Nasdaq Global Select Market under the symbol "PLCE." The Company is incorporated in Delaware and maintains its principal executive offices at 500 Plaza Drive, Secaucus, New Jersey.

19. In 2024, Mithaq acquired more than 50% of the Company's outstanding shares of common stock and became a controlling stockholder of the Company. Substantially concurrently, on February 29, 2024 and April 16, 2024, Mithaq provided approximately $168.6 million in subordinated indebtedness to the Company, a portion of which was used to pay down Company indebtedness then outstanding and owed to Wells Fargo. In 2025, Mithaq increased its holdings of common stock in the Company by subscribing for shares in a rights offering made available by the Company to all stockholders in exchange for a further reduction of Mithaq's unsecured debt.

20. The Children's Place is the Company's core value-oriented brand. Gymboree provides a differentiated, more premium product offering. The Company acquired certain Gymboree intellectual property and related assets following Gymboree Group's restructuring and subsequently relaunched the brand across its digital and other distribution channels. As part of the Company's business strategy, senior management has prioritized superior product design and merchandising, continued digital expansion, and an enhanced omni-channel customer experience

across the Debtors' brick-and-mortar, digital, and wholesale channels, including the Debtors' wholesale relationship with Amazon and international franchise relationships that generate royalty revenue.

21. The Company reports segment data based on geography: The Children's Place U.S. and The Children's Place International.

**1. The Children's Place U.S. Segment.**

22. The Children's Place U.S. segment includes the Company's U.S. (including Puerto Rico) stores, the Company's U.S.-based wholesale business, and the e-commerce businesses located at www.childrensplace.com and www.gymboree.com. Certain inventory procurement functions, such as production and design, as well as corporate overhead, including executive management, finance, real estate, human resources, legal, and information technology services, are globally managed by The Children's Place U.S. segment.

**2. The Children's Place International Segment.**

23. The Children's Place International segment includes the Company's Canadian-based stores and revenue from the Company's international franchisees, which operate over 300 points of distribution across thirteen countries. Expenses related to functions managed by The Children's Place U.S. segment, including depreciation and amortization, are allocated to The Children's Place International segment based primarily on net sales. The Canadian-based stores are operated by the Debtor, The Children's Place (Canada), LP ("TCP Canada"), an Ontario limited partnership that, as of the Petition Date, had 56 leased stores across nine Canadian provinces. TCP Canada relies on The Children's Place U.S. segment for management, corporate and shared services, and merchandise sourcing and distribution.

**B. Business Operations.**

24. The Debtors generate revenue predominantly from the sale of apparel, accessories, and footwear to end consumers through their retail stores and e-commerce platforms, supplemented by wholesale sales to partners, and royalty and product revenue generated through the Debtors' international franchise and wholesale network. The Debtors operate an approximately 700,000-square-foot distribution center in Fort Payne, Alabama and utilize third-party distribution facilities to support e-commerce fulfillment and other operations.

**1. Global Sourcing.**

25. The Company designs, sources, and contracts to manufacture the substantial majority of its branded products, and it maintains a network of sourcing offices in Hong Kong, Pakistan, Kenya, China, India, Ethiopia, and Indonesia. Bangladesh and Vietnam each accounted for more than 15% of sourced merchandise during fiscal 2025. The Company's global sourcing model historically supported attractive merchandise costs but exposes the business to tariffs, freight costs, trade policy, geopolitical developments, volatile foreign manufacturing conditions and international transportation disruptions.

**2. Retail Channel.**

26. The retail channel is the primary revenue driver for the Company and consists of over 500 Company-operated stores across the United States (including Puerto Rico) and Canada under The Children's Place and Gymboree brands. These stores serve as a critical touchpoint for the Debtors' customers and an important driver of brand awareness and digital customer acquisition, notwithstanding the continued shift in consumer shopping preferences toward e-commerce and the decline in mall and shopping-center foot traffic that has affected the broader specialty retail sector.

**3. E-commerce.**

27. The Company's principal digital storefronts are www.childrensplace.com and www.gymboree.com. The digital business allows customers to purchase substantially the same merchandise offered in stores, together with certain digital-exclusive merchandise, providing an important complement to the Debtors' physical retail footprint. The Debtors' e-commerce operations also support the Debtors' omni-channel strategy, including buy-online-pickup-in-store and ship-from-store capabilities.

**4. Wholesale.**

28. The Debtors maintain a wholesale relationship with Amazon, which is an important customer acquisition vehicle and an additional channel through which to reach value-conscious consumers who may not otherwise shop at the Debtors' branded retail locations or websites.

**5. International Franchise and Wholesale.**

29. The Company generates additional royalty revenue from ten (10) international franchise and wholesale partners. The Company earns revenue from these partners both through the sale of product and through sales-based royalty arrangements, providing international brand presence without the capital investment associated with Company-operated stores.

## II. Prepetition Corporate and Capital Structure.

### A. The Company's Corporate Structure.

30. TCP is a Delaware corporation and the ultimate parent of each of the Debtors and various non-debtor subsidiaries. The Debtors largely comprise the Company's U.S. (including Puerto Rico) and Canadian subsidiaries and operations, including among other, TCP Canada, and its general partner and limited partners, TCP Investment Canada II Corp. and TCP Investment Canada I Corp., respectively (collectively, the "Canadian Debtors"). The non-debtors consist of the Company's foreign subsidiaries who provide, among other things, sourcing, import/export,

customer service and IT support, and engage in limited wholesale and online retail sales. A structure chart depicting the Company's corporate organization is attached hereto as **Exhibit A**.

31. The TCP board of directors currently consists of six (6) individuals, including three (3) independent directors.[2] As mentioned previously, on October 2, 2026, the Company appointed Elizabeth A. LaPuma as an independent director of the TCP board of directors and its audit committee, and on November 3, 2026, the TCP board authorized the formation of a Special Committee consisting of Ms. LaPuma as the sole committee member. The TCP board delegated to the Special Committee full authority to, among other things, (a) evaluate and approve transactions related to certain specified matters, including the Debtors' filing for chapter 11, and (b) investigate any potential claims against former or current officers and directors, shareholders, or any other insider.

**B. The Debtors' Capital Structure.**

32. The following table summarizes the Debtors' principal funded indebtedness based on publicly reported amounts as of November 6, 2026.

| Facility | Principal / Drawn | Agent / Lender | Collateral / Priority |
|---|---|---|---|
| ***ABL Credit Facility*** | $110.6 million borrowings<br><br>$19.4 million in letters of credit | Wells Fargo Bank, N.A. | First-priority lien on substantially all assets (except for Term Priority Collateral (as defined below)); borrowing-base facility, second-priority on Term Loan Priority Collateral |

[2] On October 30, 2026, Kim Roy resigned from the TCP board of directors, leaving the following individuals on the board: Turki Saleh A. AlRajhi, Muhammad Asif Seemab, Hussan Arshad, Elizabeth LaPuma, Rhys Summerton, and Muhammad Umair. The Debtors' Chief Executive Officer, Muhammad Asif Seemab, and Chief Strategy Officer, Muhammad Umair, resigned from such positions on November 1, 2026.

| | | | |
|---|---|---|---|
| ***SLR Term Loan*** | $100.0 million | SLR Credit Solutions and affiliates | First-priority on specified IP, real estate, FF&E and equity pledges; second-priority on ABL Priority Collateral (as defined below) |
| ***Mithaq Term Loans*** | Approx. $151.1 million | Mithaq Capital SPC | Unsecured; contractually subordinated to the ABL Credit Facility and the SLR Term Loan |

33. ***ABL Credit Facility***. The Debtors are party to an Amended and Restated Credit Agreement, originally dated as of May 9, 2019, with Wells Fargo as administrative agent and collateral agent ("Prepetition ABL Agent"), and the lenders party thereto, providing for a $350.0 million asset-based revolving credit facility (as amended through the Ninth Amendment thereto dated as of September 24, 2026, the "ABL Credit Facility"). As of the Petition Date, the Debtors had approximately $110.6 million of outstanding borrowings and approximately $19.4 million of outstanding standby letters of credit under the ABL Credit Facility. The ABL Credit Facility is secured by a first priority security interest in substantially all of the Debtors' assets except for certain specified Term Priority Collateral (as defined in the Intercreditor Agreement), in which it holds a second priority security interest. The borrowers include TCP, The Children's Place Services Company, LLC, TCP Canada, TCP Brands, LLC and The Children's Place International, LLC, with certain additional subsidiaries providing guarantees.

34. ***SLR Term Loan***. On December 16, 2025, the Debtors entered into a term loan agreement with SLR and other affiliated SLR entities as lenders, and SLR as administrative agent and collateral agent (the "Prepetition Term Loan Agent" and together with the Prepetition ABL Agent, the "Prepetition Agents"), providing for a $100.0 million term loan (as amended through the First Amendment dated as of September 24, 2026, the "SLR Term Loan"). The Debtors used the net proceeds of the SLR Term Loan to partially pay down borrowings under the ABL Credit Facility. The SLR Term Loan matures on the earlier of (i) December 16, 2030, (ii) the maturity

date under the ABL Credit Facility, or (iii) ninety-one (91) days prior to the maturity date of any other Material Indebtedness (as defined in the SLR Term Loan), including the Mithaq Term Loans (as defined below), of the Borrowers' in an aggregate principal amount exceeding \$9.0 million, and is secured by substantially all of the Debtors' assets with a first priority security interest in certain specified intellectual property, real estate, furniture, fixtures, equipment and equity interests of the loan parties and a second priority security interest in the ABL Priority Collateral (as defined in the Intercreditor Agreement). As of the Petition Date, \$100.0 million remained outstanding under the SLR Term Loan.

35. ***Intercreditor Agreement***. Wells Fargo, as administrative agent and collateral agent for the ABL Lenders and L/C Issuers under the ABL Credit Facility (the "Prepetition ABL Agent"), and SLR, as administrative agent and collateral agent for the Term Lenders under the SLR Term Loan (the "Prepetition Term Loan Agent"), are parties to that certain Intercreditor Agreement, dated as of December 16, 2025 (the "Intercreditor Agreement"), which was acknowledged by TCP, as lead borrower, and the other Borrowers and Guarantors party thereto. The Intercreditor Agreement governs the relative priority of the liens granted by the Debtors to the Prepetition ABL Agent, for the benefit of the ABL Credit Parties (as defined in the Intercreditor Agreement), and to the Prepetition Term Loan Agent, for the benefit of the Term Credit Parties (as defined in Intercreditor Agreement), over the Collateral securing the Debtors' respective obligations under the ABL Credit Facility and the SLR Term Loan, together with certain other rights, priorities and interests as between the ABL Credit Parties and the Term Credit Parties.

36. ***Mithaq Term Loans***. The Debtors are also party to a series of unsecured and subordinated promissory notes with Mithaq. The first promissory note, dated February 29, 2024 (the "First Mithaq Term Loan"), originally provided for up to \$78.6 million in loans; following a

$60.2 million reduction in connection with the Company's February 2025 rights offering, to which Mithaq subscribed, approximately $18.4 million remained outstanding as of August 1, 2026. The second promissory note, dated April 16, 2024 (the "Second Mithaq Term Loan"), provided for an additional $90.0 million in loans. The third promissory note, dated July 1, 2026 (the "Third Mithaq Term Loan,"), provided for $15.0 million in loans as the first advance under a $40.0 million commitment letter. The fourth promissory note, dated September 24, 2026 provided an additional $25.0 million in loans (constituting the remainder of the amounts available under the $40.0 million commitment letter) (the "Fourth Mithaq Term Loan", and together with the First Mithaq Term Loan, the Second Mithaq Term Loan, and the Third Mithaq Term Loan, the "Mithaq Term Loans"). The Company used the proceeds from the Mithaq Term Loans to reduce the then existing asset-based revolving credit facility with Wells Fargo (which was later refinanced into the existing ABL Credit Facility), pay a portion of vendor accounts payable and fund working-capital requirements. In the aggregate, approximately $151.1 million remains outstanding under the Mithaq Term Loans as of the Petition Date. The Mithaq Term Loans are subordinated in payment priority to the Debtors' obligations under the ABL Credit Facility and the SLR Term Loan pursuant to a Second Amended and Restated Subordination Agreement, dated as of December 16, 2025, among Wells Fargo, SLR, Mithaq, and the Debtors, as amended through the First Amendment thereto dated as of September 24, 2026.

37. ***Trade, Lease, and Other Obligations***. As of the Petition Date, the Company reported approximately $141.2 million of accounts payable. The Company also incurs material ordinary-course obligations to merchandise vendors, landlords, freight and logistics providers, payment processors, technology providers, taxing authorities and other counterparties.

38. ***Equity Interests***. As of September 8, 2026, the Company had approximately 22,237,067 shares of common stock outstanding. Mithaq is the Company's largest stockholder, beneficially owning approximately 61.1% of the Company's outstanding common stock as of August 14, 2026, the date of Mithaq's most recent amendment to its Schedule 13D filing with respect to the Company. The remainder of the shares are broadly held. Following the Company's announcement of its second quarter Fiscal 2026 results on September 14, 2026, the Company's common stock fell sharply over the following trading sessions, including a single-day decline of approximately 23.8% to $1.90 per share on September 15, 2026, and has since continued to trade at depressed levels.

## III. Events Preceding These Chapter 11 Cases.

### A. Challenges.

39. As a pure-play children's specialty retailer, the Debtors have long competed in a highly fragmented and promotional segment of the apparel retail industry, facing competition from mass merchants, off-price retailers, e-commerce platforms, and other specialty children's apparel retailers. In recent years, this competitive pressure has intensified as consumers have increasingly shifted discretionary spending toward value-oriented and digitally native retailers, while persistent inflation and tariffs on imported goods have increased the Debtors' cost of goods sold. U.S. segment sales were adversely affected by lower direct-to-consumer traffic, planned reductions in wholesale shipments and efforts to liquidate aged fashion inventory. These trends reduced gross profit dollars against a substantial fixed-cost base. The Company's reliance on imported merchandise also exposes it to t changes in U.S. trade policy. During fiscal 2025 and fiscal 2026,

the Company reported paying approximately $40.0 million of tariffs imposed pursuant to the International Emergency Economic Powers Act.[3]

40. These pressures have had a material adverse effect on the Company's financial performance. Net sales declined from approximately $1.386 billion in fiscal 2024 to approximately $1.209 billion in fiscal 2025. Comparable retail sales declined approximately 8.4% during fiscal 2025. The deterioration continued in fiscal 2026: for the twenty-six (26) weeks ended August 1, 2026, net sales declined approximately 15.4% to approximately $457.0 million (down from approximately $540.1 million in the corresponding prior-year period).

41. Fiscal 2025 gross profit declined materially as lower sales, promotional activity and fixed operating costs pressured results. The Company's store occupancy, distribution, technology and corporate infrastructure includes costs that cannot be reduced proportionately or immediately as revenue declines. The Company's net loss for the first half of fiscal 2026 was approximately $84.1 million. This deterioration in performance placed significant strain on the Debtors' liquidity. Accounts payable grew increasingly past due as the Debtors sought to preserve cash. The combination of seasonal inventory investments and continued operating losses placed additional pressure on liquidity entering the second half of fiscal 2026.

**B. Proactive Approach to Address Financial and Operational Issues.**

42. In light of these headwinds, beginning in fiscal 2025 and continuing into fiscal 2026, the Company's management and board of directors took immediate steps to maximize value for all stakeholders. First, the Company evaluated and pursued various refinancing and liquidity

---

[3] Although the Company subsequently received approximately $39.0 million of tariff refunds during the second quarter of fiscal 2026, excluding interest, the Company had monetized most of those refund claims and used proceeds primarily to reduce short-term debt. Accordingly, the refunds did not eliminate the underlying operating and liquidity pressures.

initiatives, including obtaining the SLR Term Loan and the third and fourth Mithaq Term Loans. In parallel, the Company also pursued various operational measures. Eventually, the Company engaged the Advisors to help evaluate a variety of strategic alternatives. Each of these initiatives is discussed further below.

**1. Refinancing and Liquidity Initiatives.**

43. Management and the TCP board of directors pursued multiple initiatives intended to improve liquidity and provide the business additional runway. Mithaq provided substantial subordinated financing beginning in 2024. In February 2025, Mithaq subscribed to shares of the Company's rights offering, which was available to all shareholders, in exchange for a reduction of the Mithaq Term Loan obligations.

44. In December 2025, the Company refinanced its senior capital structure through amendments to the ABL Credit Facility and the new $100.0 million SLR Term Loan.

45. The Company obtained a further $15.0 million advance from Mithaq in July 2026 and an additional $25.0 million advance in September 2026. The proceeds of these financings were used to reduce the then existing asset-based revolving credit facility with Wells Fargo, pay vendor accounts payable, and support working capital.

46. These transactions provided meaningful liquidity, but the Company continued to carry substantial funded indebtedness and interest expense, as well as fixed costs, against deteriorating performance.

**2. Operational Improvement Efforts.**

47. The Company undertook a comprehensive review of the Debtors' cost structure and store footprint in an effort to preserve liquidity and position the Debtors to pursue a value-maximizing restructuring. As part of that review, the Company identified more than $100.0 million of run-rate actionable cost-saving opportunities across the business, including

organizational redesign, store footprint rationalization, distribution and supply chain efficiencies, and corporate overhead reductions. The Debtors also optimized inventory management: inventory declined by more than $100.0 million between August 2, 2025 and August 1, 2026, reflecting significant efforts to improve inventory management.

48. The Debtors believe these operational changes were a necessary and prudent response to the Debtors' financial circumstances and will meaningfully preserve value for the benefit of the Debtors' estates and stakeholders. Those measures, however, are ongoing and did not offset the magnitude of the revenue decline and operating losses.

**3. Prepetition Restructuring Efforts.**

49. In light of the challenges described above, the Debtors retained the Advisors to assist the Debtors in evaluating and pursuing strategic alternatives.

50. Since their respective engagements, the Debtors' professionals have worked diligently with the Company and its key stakeholders in evaluating the full range of restructuring options. For example, the Debtors evaluated a standalone divestiture of the Gymboree brand and related intellectual property, which the Debtors believed presented an opportunity to maximize value separate and apart from a sale of the Debtors' core retail operations. The Debtors also evaluated a potential transaction whereby certain intellectual property assets could be retained in a new "IPCo" structure and licensed to wholesalers and retail store operators, with other business assets liquidated or sold to a third party. At the same time, Cascadia worked diligently with potential strategic and financial parties to solicit bids for both a going-concern and liquidation transaction involving all or substantially all of the Debtors' assets. These prepetition sale efforts are discussed further below.

51. In parallel, BRG worked alongside the Company to continue identifying cost-saving and optimization opportunities, and analyzing the Company's liquidity position and cash

flow forecasts. Among other things, the Debtors determined, in consultation with the Advisors, that a substantial reduction of the Debtors' store footprint was necessary to align the Debtors' physical presence with current and projected customer demand and to preserve liquidity for the benefit of the estates. The Company engaged the Real Estate Advisor to support lease negotiations with landlords.

52. Through this process, the Company and Advisors engaged with the Debtors' lenders, Mithaq, vendors, and other key stakeholders regarding the various strategic options available, and the best means for implementation—whether out-of-court or through a chapter 11. After extensive consideration, the Debtors determined that commencing these chapter 11 cases to continue orderly store closure sales while pursuing a sale process for a viable going-concern transaction in parallel, represents the best available path to maximize value for the Debtors' estates and stakeholders.

**C. The Prepetition Sale Process.**

53. In September 2026, Cascadia, together with Company management, launched an extensive marketing process to solicit interest in a sale of the Debtors' business, whether as a going concern or liquidation, or a standalone sale of discrete assets or revenue streams such as the "Gymboree" brand and the Debtors' Amazon operations. As part of that process, Cascadia contacted a broad range of strategic and financial parties, including to approximately thirty-three (33) strategic prospects and approximately seventeen (17) financial prospects, numerous of which executed confidentiality agreements and were granted access to an electronic data room containing diligence materials regarding the Debtors' business and assets.

54. To date, the Debtors have received nine (9) proposals relating to their assets, including six (6) proposals for going concern and IP-related transactions, and three (3) "equity"

liquidation proposals involving substantially all of the Debtors' assets. These proposals reflect ongoing interest in the Debtors' Assets. Following receipt of these proposals, the Debtors, together with Cascadia, conducted a comprehensive review of each proposal and have engaged and continue to engage in extensive negotiations with the interested parties to refine and enhance their initial bids.

55. Given the upcoming holiday season, time was of the essence in commencing liquidation sales. After careful evaluation and discussion with their Advisors and stakeholders, including the secured lenders, the Debtors decided that engaging a consultant to conduct an orderly liquidation of their inventory assets and store closures on a consulting, fee-based arrangement, would maximize value for the Debtors' estates. The Debtors received three (3) different proposals from national liquidation firms. After engaging in additional negotiations, the Debtors selected the Consultant. On November 3, 2026, the Debtors entered into the certain GA/TCP Consulting Agreement by and between Consultant and the Company (the "Consulting Agreement"), and such liquidation sales commenced on November 6, 2026. The Debtors and their Advisors believe that that the terms set forth the Consulting Agreement, including the percentage fee-based structure and the ability to halt store closures should a going-concern bid become actionable, is the best and most value-maximizing alternative for the conduct of asset sales and store closures.

**IV. The Proposed Chapter 11 Strategy.**

56. The Debtors intend to use these chapter 11 cases to continue the orderly inventory liquidations while pursuing a marketing process to solicit higher and better bids for the sale of their operational assets and intellectual property.

57. At the outset of these cases, the Debtors seek authority to continue streamlined operations to preserve the ability to pursue a value-maximizing sale transaction, including authority to pay employees, maintain certain customer programs, continue cash-management

practices, honor certain obligations necessary to preserve certain vendor relationships, and obtain access to liquidity to fund the chapter 11 cases. This first day relief will help stabilize operations so that the Company can preserve the business for a sale transaction.

**A. Sale Transaction.**

58. To implement their sale strategy and maximize value for the estate, contemporaneously herewith, the Debtors have filed the *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures and Stalking Horse Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets, and (VII) Granting Related Relief* (the "Bidding Procedures Motion"), seeking approval of bidding procedures to govern a postpetition marketing and sale process for the Debtors' assets. The process for soliciting formal bids from potential bidders will be conducted pursuant to the order approving the Bidding Procedures Motion (the "Bidding Procedures Order"). As discussed in greater detail in the *Declaration of Lorie Beers in Support of the Bidding Procedures Motion*, the procedures attached as **Exhibit 1** to the Bidding Procedures Order (the "Bidding Procedures") create an orderly process for the parties to submit formal bids, and if necessary, participate in an auction to select the highest or otherwise best bid.

59. The Bidding Procedures will allow the Debtors to designate one or more stalking horse bidders for all or any portion of the assets by entering into agreements with such stalking horse bidder and granting bid protection to any stalking horse bidder. The Bidding Procedures propose a final bid deadline of December 9, an auction on December 11, and a sale hearing on December 15. Given the significant prepetition marketing efforts and engagement by multiple

bidders, the sale timeline provides sufficient time for potential bidders to complete diligence and submit bids, while also minimizing administrative expenses and business disruption as the Debtors work to complete these chapter 11 cases on an efficient and expeditious timeline.

**B. Inventory Liquidation.**

60. In parallel to pursuing a sale transaction, the Debtors will continue to conduct inventory sales at all of their retail locations in accordance with the terms of the Consulting Agreement. The Debtors anticipate that the inventory sales will continue through February 28, 2027. The proceeds and eventual labor cost savings from these sales are expected to provide the Debtors with much needed liquidity.

61. To streamline and facilitate the inventory liquidation, the Debtors have filed contemporaneously herewith, the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement; (II) Authorizing and Approving the Conduct of Store Closing Sales and the Related Sale Guidelines, with Such Sales to be Free and Clear of all Liens, Claims, and Encumbrances; (III) Modifying Customer Programs at the Closing Stores; and (IV) Granting Related Relief*, seeking authority to (a) approve the Debtors' assumption of the Consulting Agreement with the Consultant and (b) continue and, as applicable, commence inventory liquidations in accordance with specified guidelines and the terms of the Consulting Agreement (the "Store Liquidation Motion").[4]

**C. DIP Financing.**

62. As discussed above, the proposed DIP Facilities are intended to support the Debtors' transition into these chapter 11 cases and provide a framework for funding their

---

[4] The Store Liquidation Motion seeks approval of sale guidelines that will govern the conduct of the store inventory sales at the Debtors' stores in Canada, which will also be subject to approval by the Canadian Court (as defined herein).

operations and the administration of the cases while they pursue a value-maximizing sale process. Contemporaneously herewith, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* seeking approval of the DIP Facilities (the "DIP Motion").

63. Subject to Bankruptcy Court approval, the DIP Facilities contemplate continued revolving credit availability and the eventual refinancing of the ABL Credit Facility and SLR Term Loan obligations, including through the roll-up of such prepetition indebtedness. Availability under the DIP ABL Facility would be subject to a borrowing base, applicable reserves, and other borrowing conditions. The DIP Facilities would be secured by liens on substantially all of the Debtors' assets and supported by superpriority administrative expense claims, subject to the applicable lien priorities and carve-out set forth in the DIP Order. The liquidity provided by the DIP Facilities and use of cash collateral will support budgeted employee, occupancy, distribution, inventory-sale, critical vendor, and case-administration expenses, helping the Debtors preserve and enhance the value of their assets.

64. The DIP Facilities are subject to the DIP Budget attached as **Exhibit B** to the interim order approving the DIP Motion (the "Interim DIP Order"). I have reviewed the DIP Budget and believe the DIP Facilities are appropriately sized to pay the expenses set forth in such budget.

65. The proposed roll-up would refinance prepetition debt into postpetition DIP obligations as follows:

i. ***ABL Credit Facility***. Following entry of the Interim DIP Order, ABL collateral collections would be applied first to repay prepetition ABL Credit Facility obligations while DIP advances fund operations, creating a collection-based refinancing mechanism. Existing letters of credit, cash-management obligations, and bank-product obligations would become obligations under the DIP ABL Facility upon entry of the Interim DIP Order. Any remaining prepetition revolving loans would be rolled into the DIP ABL Facility upon entry of the final DIP order.

ii. ***SLR Term Loan***. Upon entry of the Interim DIP Order, $16.0 million of prepetition obligations under the SLR Term Loan is proposed to be rolled into the DIP Term Facility, with the remaining prepetition SLR Term Loan obligations rolled up upon final approval of the DIP Motion.

66. The proposed DIP Facilities also include milestones that currently provide for entry of a final DIP order by December 8, 2026, entry of sale order(s) by December 17, 2026, and consummation of the asset sale or sales by December 31, 2026. I believe these milestones are achievable and consistent with the Debtors' chapter 11 strategy.

**D. Canadian Recognition Proceedings**

67. Concurrently with the filing of this Declaration, the Debtors have filed the *Debtors' Motion for Entry of an Order (I) Authorizing The Children's Place, Inc. to Act as Foreign Representative and (II) Granting Related Relief* (the "Foreign Representative Motion"), seeking authority for TCP to act as foreign representative on behalf of the Debtors' estates pursuant to section 1505 of the Bankruptcy Code. If appointed in such capacity, TCP intends to: (a) seek recognition of these chapter 11 cases as a "foreign main proceeding" in ancillary proceedings

before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, with a view to protecting the Debtors', including the Canadian Debtors', assets in Canada and ensuring the coordinated administration of the Debtors' estates; and (b) the Canadian Court's recognition and enforcement of certain of the first day and other orders, if granted, in Canada, including a charge to secure the Canadian Debtors' obligations under the DIP Facility.

68. Promptly following the filing of the petitions, TCP, as proposed foreign representative, applied to the Canadian Court for an interim stay of proceedings in Canada to preserve the status quo pending the Court's consideration of the Foreign Representative Motion and TCP's appointment as foreign representative. I understand from Canadian counsel to the Company that the interim stay application was granted.

69. The Debtors believe that recognition of these chapter 11 cases in Canada will facilitate the coordinated administration of the Debtors' estates, allow the Debtors' Canadian business to continue operating without interruption and the inventory liquidations in Canada to proceed in an orderly manner, and preserve the value of the Debtors' assets and estates, with this Court maintaining principal oversight of the Debtors' restructuring.

## V. Evidentiary Support for First Day Motions.

70. Concurrently with the filing of these chapter 11 cases, the Debtors filed the First Day Motions, which request relief that is necessary to enable the Debtors to preserve and maximize the value of their estates. The First Day Motions include:

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 3].
- *Application for Designation as a Chapter 11 Complex Case* [Docket No. 4]
- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' Thirty Largest*

*Unsecured Creditors, (B) Omit Customers from the Consolidated Creditor Matrix and Approve Related Customer Noticing Procedures, (C) File a Consolidated List of Creditors in Lieu of a Separate Mailing Matrix for Each Debtor, (D) Redact Certain Personally Identifiable Information of Individuals, (E) Serve Certain Parties in Interest by Email, (F) Waive the Requirement to File an Equity List and Provide Notices Directly to Equity Security Holders, and (II) Granting Related Relief* [Docket No. 6].

- *Debtors' Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief* [Docket No. 7].

- *Debtors' Motion for Entry of Interim and Final Orders (I) Establishing Notification and Hearing Procedures on Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock, and (II) Granting Related Relief* [Docket No. 8].

- *Debtors' Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code; (II) Approving the Form and Manner of Notice; and (III) Granting Related Relief* [Docket No. 9].

- *Debtors' Motion for Entry of an Order (I) Authorizing The Children's Place, Inc. to Act as Foreign Representative and (II) Granting Related Relief* [Docket No. 10].

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief* [Docket No. 11].

- *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 12].

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage and the Surety Standby Letters of Credit Entered into Prepetition and Pay Related Prepetition Obligations, (B) Renew, Supplement, Modify, or Purchase Insurance, Surety Coverage, and Related Letters of Credit, and (C) Continue to Pay Broker Fees and Honor Obligations Under Premium Financing Agreements and (II) Granting Related Relief* [Docket No. 13].

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Honor*

*Prepetition Obligations Related Thereto, (B) Maintain Existing Bank Accounts, (C) Perform Intercompany Transactions in the Ordinary Course, and (D) Maintain Existing Business Forms; (II) Granting an Interim Extension and Final Waiver of the Section 345(b) Deposit and Investment Requirements; and (III) Granting Related Relief* [Docket No. 14].

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants; (II) Granting Administrative Expense Priority to Undisputed Obligations on Account of Outstanding Orders; and (III) Granting Related Relief* [Docket No. 15].
- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* [Docket No. 16].
- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* [Docket No. 17].
- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing (A) Payment of Prepetition Wages, Salaries and Other Compensation and (B) Continuation of Benefits Programs, and (II) Granting Related Relief* [Docket No. 18].
- *Debtors' Motion for Entry of Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 19].
- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement; (II) Authorizing and Approving the Conduct of Store Closing Sales and the Related Sale Guidelines, with Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances; (III) Modifying Customer Programs at the Closing Stores; and (IV) Granting Related Relief* [Docket No. 20].
- *Debtors' Application for Expedited Consideration of First Day Matters* [Docket No. 23].

71. I have reviewed each of the First Day Motions (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate

reliance on the Debtors' officers, employees, and advisors. I incorporate by reference the factual statements in each of the First Day Motions as though fully set forth herein.

72. I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to transition into chapter 11 and continue their operations in a manner consistent with their chapter 11 strategy. I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to make certain essential payments as sought in the First Day Motions.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: November 9, 2026

*/s/ Rudolph Morando*
Name: Rudolph Morando
Title: Co- Chief Restructuring Officer

**Exhibit A**

Organizational Chart


THE CHILDREN'S PLACE, INC. (DE)
The Children's Place Canada Holdings, Inc. (DE)
The Children's Place International, LLC (Virginia)
4.515%
TCP Brands, LLC (DE)
TCP International Product Holdings, LLC (DE)
TCP Real Estate Holdings, LLC (DE)
AMASKIT, LLC (DE)
The Children's Place Services Company, LLC (DE)
95.385%
50%
TCP IH II, LLC (DE)
thechildrensplace.com , inc. (DE)
GYM-IPCO, LLC (DE)
TCP Worldwide Holdings Limited (Hong Kong)
TCP Investment Canada I Corp. (Nova Scotia)
TCP Investment Canada II Corp. (Nova Scotia)
The Children's Place (Hong Kong) Limited (Hong Kong)
TCP Canada Inc. (Nova Scotia)
The Children's Place (Barbados) Inc. (Barbados)
The Children's Place Asia Holdings Limited (Hong Kong)
The Children's Place Mauritius Holdings Limited (Mauritius)
The Children's Place Apparel Trading (Shanghai) Limited Company (Shanghai)
LP = ~99%
GP = ~1%
The Children's Place (Canada), LP (Ontario)
Certain Foreign Subsidiaries
Legend
Chapter 11 Debtor
(unshaded interior = non-Debtor)
Borrower under Wells Fargo ABL
Guarantor under Wells Fargo ABL
Borrower under SLR Term Loan
Guarantor under SLR Term Loan
Maker under Mithaq Term Loans
Guarantor under Mithaq Term Loans